**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **Shasta A. POOLE***, et. al*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:09-CV-233 (MTT)** |
| | ) | |
| **Alex BELL,** *et. al*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

This matter is before the Court on the Defendants' Motion for Summary Judgment.  (Doc. 31).  For the following reasons, the Motion is **GRANTED in part and DENIED in part** with regard to Plaintiffs Harold Lee Hartel and Jimmie Hartel and **GRANTED** with regard to Plaintiff Shasta Poole.

## I.  FACTUAL BACKGROUND

This action arises from the arrest of Plaintiff Harold Lee Hartel and the placement of Plaintiffs Shasta Poole and Jimmie Hartel into custody.[1]  On July 11, 2007, Lee and his wife Jimmie invited their friend Poole over for a cookout.  Lee "sipped" three beers by the pool, but he claims the amount he consumed was equivalent to "one beer or less than a beer."  (Doc. 37, Deposition of Lee Hartel, at 53).  The Plaintiffs ate watermelon around 6:30 pm while the charcoals were heating on the grill.  Lee and Poole walked to the street and threw the watermelon rinds into a ditch across the street near the Stille home.  Discarding watermelon rinds in this manner was the Plaintiffs' usual practice.

---

[1] Because the Parties disagree whether Poole and Jimmie were taken into "protective custody," the Court will use the terms "detention" or "custody."

(Doc. 36, Deposition of Jimmie Hartel, at 21); (Doc. 35, Deposition of Shasta Poole, at 67).  Usual practice or not, the Stilles considered this method of disposal littering, and they reported the offense to the Twiggs County Sheriff's Office.  Defendant Deputy Anthony Watson was dispatched to investigate the matter.

Watson first went to the Stille home to talk to them about their complaint.  He then walked over to the Hartel home.  The front door was open, but the outer storm door with a transparent opening at the top was closed.  Poole went to answer the door and Jimmie followed.  Watson specifically asked to speak with Lee and Poole.  Poole opened the storm door and acknowledged herself.  Watson told Poole that he was there to speak about the watermelon rinds.  Poole said she did not know discarding watermelon rinds constituted littering, but she would pay a fine, if any.  Watson told Poole he only was going to give her a warning.  After Watson finished speaking with Poole, he asked to speak with Lee.

Watson asked Lee to step out on the porch, but Lee refused.  Lee claims he did not want to step outside because he did not want neighbors to know about his private affairs.  Lee told Watson he could come inside to discuss the matter.  Watson did not want to come inside and Lee said "you can write us a ticket and … be over with it." (Doc. 37, Deposition of Lee Hartel, at 74).  Lee then walked toward the couch in the "sunroom," and told Poole and Jimmie to come inside.

At oral argument, Watson's counsel acknowledged, properly, that at that point Watson did not have probable cause to enter the Hartel home or to arrest Lee.  Counsel maintained, however, that Watson entered the home with Lee's consent.  Watson's testimony, however, is to the contrary:

Q.      So why did you leave the porch to come in the front door?

A.      Because he would not - he was obstructing my investigation and he

        was fixing to be arrested for littering and obstruction.

Q.      So my question was:  You were coming in the house for the

        purpose of arresting him?

A.      Yes, ma'am, at this point in time.

(Doc. 54, Deposition of Anthony Watson at 50).  Indeed, Watson testified that he

announced his attentions either before or after he was entering the house:

Q.      But you did go in the house; correct?

A.      Yes, once I told him that I was going to arrest him because of his

        actions.

(*Id.* at 49).  As he entered the house, Watson had one hand on his handcuffs and the

other on his gun.  He then began pulling his gun from its holster.  At that point, the

Parties' accounts of what happened inside the Hartel home differ wildly.

According to Watson, Lee picked up a pistol, pointed it at him, and said "take

your hand off that gun before I f***ing shoot you."  *Id.* at 50.  Watson lifted his hand off

his gun and asked Lee to put his gun down, but Lee refused.  When Watson took one

step backwards, Lee told him "If you try to run, I'm gonna to shoot you mother***er, do

you understand me?"  *Id.* at 51.  The two sat down, but Lee kept his pistol in his hand.

Watson then concluded it would be a good idea to listen to Lee's complaints:  "I'm sitting

there staring down the barrel of a gun so I'm going to be your best friend till that gun is

out of play."  *Id.* at 55.  When the two moved to another room, Lee placed the gun on his

coffee table.  While Lee aired his grievances, Poole picked up the pistol and left the room.

According to Lee, he picked up his pistol when he saw Watson reaching for his, "showed" it to Watson, and said "please let's don't do this."  (Doc. 37, Deposition of Lee Hartel, at 77).  Lee denies that he pointed the pistol at Watson.  Indeed, Lee claimed his finger was never on the trigger and he was holding it sideways.  Claiming that he didn't want any trouble, Lee told Watson to "just put your pistol up please."  *Id.* at 78.  Lee claims that he then told Watson that he was about to turn around and place the pistol back on the table so "please don't shoot me in the back."  *Id.*  Lee then placed the pistol on the table with the handle facing Watson.  Poole picked up the pistol and moved it to the Hartel's bedroom.

Lee's then-tenant, his friend Melissa Thompson, and Thompson's young daughter entered the Hartel home while Watson was still there.  Watson knew Thompson from the magistrate judge's office, and they spoke for about ten minutes.  Watson left the Hartel home shortly after he finished speaking with Thompson.  Lee "went back and checked [his] coals."  (Doc. 37, Deposition of Lee Hartel, at 92).  Thompson and company left the Hartel home about ten minutes after Watson left.

Watson immediately contacted his partner Defendant Scott Radebaugh and told Radebaugh to meet him at Defendant William Stokes', also a deputy, nearby home.  Defendant Lieutenant Robert Rodgers heard Watson on the sheriff's office radio and contacted Watson because he sensed something was wrong.  Watson told Rodgers that Lee had pulled a gun on him.  Rodgers then conveyed Watson's version of what had happened at the Hartel home to Stokes, Defendant Deputy Alex Bell, Defendant

Sheriff Darren Mitchum, and Defendant Chief Deputy Billy Boney.  Rodgers also contacted Twiggs County Magistrate Judge David Brown about procuring a search warrant.  Boney, Rodgers, and Bell joined Watson and Radebaugh at the Stokes home.  Watson recounted the facts of his encounter with Lee, and the deputies decided to go to the Hartel home to arrest Lee.

The deputies arrived at the Hartel home[2] before sunset[3] and surrounded it.  A patrol vehicle blocked the road until the deputies could figure out what was going on.  Because it was getting dark outside, the deputies used spotlights.  The deputies were armed with handguns, shotguns, and Bell carried an M-16 rifle.  As the Plaintiffs now describe it, it looked like "Ruby Ridge" or "Waco."  Nevertheless, the Plaintiffs claim they thought the deputies were there because of the discarded watermelon rinds.[4]  When the deputies arrived, Thompson and company came out of the rental home to see what was going on, and Radebaugh, who also recognized Thompson from the magistrate judge's office, told them to leave the premises for their safety.

Lee, unarmed, came to the porch where he "probably" shouted obscenities at the deputies.  (Doc. 37, Deposition of Lee Hartel, at 97).  The deputies asked Lee to come off the porch, but he refused and instead invited the deputies to come to the porch.  The

---

[2] Stokes met the officers at the Hartel home.

[3] The Court takes judicial notice that sunset was at 8:50 pm on July 11, 2007, in Atlanta, Georgia, which is approximately 90 miles from the Hartel home.  Visit http://www.timeanddate.com/worldclock/sunrise.html, select U.S.A. – Georgia – Atlanta, and select July 2007.

[4] Even Poole acknowledged this belief, given previous events and the magnitude of forces arrayed before the Hartel home, was "naïve."  (Doc. 35, Deposition of Shasta Poole, at 102).

deputies held their positions, and Lee repeatedly walked back and forth between the porch and the inside of the home.

Boney directed the deputies to take the women – who also had been shouting at the deputies – into custody, he claims, for their safety.  When the Hartels' deaf and nearly blind dog slipped out of the home (perhaps exercising better judgment than all other participants in the unfolding drama), Poole went to the porch to look for him. Rodgers grabbed her off the porch, and Radebaugh handcuffed her behind her back and pulled her by the handcuffs into the back of a patrol vehicle.  Bell also was involved with placing Poole into custody.  Poole claims she told the deputies that they were hurting her.  (Doc. 35, Deposition of Shasta Poole, at 103).  Jimmie also went on the porch to look for the dog and was grabbed by Boney, handcuffed, and placed into the vehicle with Poole.  Jimmie did not convey feelings of pain, but she did ask the deputies to pull down her top that rose while she was transported to the patrol vehicle.  Lee became "very upset" at the deputies for "manhandling" his wife.  (Doc. 37, Deposition of Lee Hartel, at 98).

At that point, Lee was the only one in the home.  Sheriff Mitchum telephoned Lee and told him to come outside to talk to the deputies and confirm that he did not have a weapon on him.[5]  At first, Lee resisted this request because he had already conveyed his message to the deputies "four or five times," an apparent reference to what the deputies described as Lee's obscenity-laden taunts.  (Doc. 37, Deposition of Lee Hartel, at 101).

---

[5] Sheriff Mitchum was familiar with Lee and had his number because Lee had called Mitchum about signing someone's bond a few weeks earlier.

Nevertheless, Lee eventually walked outside to the porch to announce he was not carrying a weapon, and Boney shot him with a TASER[6] from the left side of the porch.  The probes went through Lee's clothes, but did not pierce his skin.  Lee, still standing, removed the probes and yelled "it would take more than that 'motherf***er' to take him."  (Doc. 32, Defendants' Statement of Material Facts, at ¶ 81); (Doc. 44, Plaintiffs' Response to Defendants' Statement of Material Facts, at ¶ 81).  After Boney tased Lee, Lee went back inside and received another call from Mitchum.  Mitchum asked Lee if he had a gun on him, and Lee replied in the negative.  Mitchum told Lee he would arrive at the home shortly, and Lee gave Mitchum permission to enter the home when he arrived.

Judge Brown arrived at the home to issue the warrant after Lee had been tased. Once Judge Brown realized he was at the Hartel home, he decided to use their preexisting relationship to "get the situation ironed out where [Lee] would be safe to come out."  (Doc. 64, Trial Testimony of Magistrate Judge David Brown at 244).  Judge Brown telephoned Lee, and Lee gave him permission to come inside.  Lee did not mention Watson pulling a gun to Judge Brown, but rather he was upset about an incident that occurred a few weeks earlier when Stokes failed to act on a threat made by Mr. Stille.[7]

---

[6] "A 'taser' is a non-deadly weapon commonly carried by law enforcement. The taser administers an electric shock to a suspect by shooting two small probes into the suspect's body. The probes are connected to the firing mechanism via wires.  Once fired, the probes lodge under the suspect's skin and administer an electric shock. This type of taser permits the officer to incapacitate a suspect from a modest distance."  *Fils v. City of Aventura*, 647 F.3d 1272, 1276 n.2 (11th Cir. 2011).  Because the term refers to products from TASER International, Inc., the Court will refer to the device as a TASER.

[7] According to Stokes, the altercation was related to Lee discarding food in the ditch.  (Doc. 56, Deposition of William Stokes, at 18-19).

Approximately five to ten minutes after Judge Brown went inside, Mitchum, Rodgers, and Stokes entered the home.  Lee felt Stokes was the source of his problems, and he asked Stokes to leave.  Stokes walked away, and Lee surrendered to Mitchum without further incident.

Poole and Jimmie then were released from the patrol vehicle.  Poole was in custody for approximately 45 minutes, and Jimmie was in custody for approximately 15-20 minutes.  After Jimmie was released, Mitchum brought her inside to retrieve the pistol Lee "showed" to Watson.  Mitchum also removed a shotgun he found inside for the safety of the deputies and neighbors.

Lee was taken to Twiggs County Jail and later Laurens County Jail.  Lee's blood alcohol content was not measured when he was taken into custody.  Because Lee experienced chest pains and vomited, he was taken to a hospital in Cochran, Georgia between 11 pm and midnight.  Jimmie posted Lee's bond while he was at the hospital, so he went home once he was released from the hospital around 1:30 pm on July 12, 2007.

Watson obtained an arrest warrant for felony obstruction of a peace officer, O.C.G.A. § 16-10-24(b), the same day Lee was released.  Lee was indicted in Twiggs County for aggravated assault, terroristic threats, and false imprisonment.  At trial, Lee moved for a directed verdict of acquittal, but his motion was denied.  The jury found him not guilty on all charges.  Neither Poole nor Jimmie was charged.

It is difficult to tell from the Plaintiffs' Complaint exactly what claims they are asserting.  However, reading the Complaint in the most favorable light possible, and with the aid of the Plaintiffs' briefs, it seems the Plaintiffs are asserting federal and state

claims for unreasonable search and seizure,[8] false arrest, false imprisonment, malicious prosecution, excessive force, and failure to intervene against all Defendants, and state law claims for assault, battery, and free speech against all Defendants.  The Plaintiffs assert federal and state claims for inadequate training and supervision against Sheriff Mitchum and Chief Deputy Boney.

Watson filed a counterclaim against Lee for aggravated assault, false imprisonment, and intentional infliction of emotional distress pursuant to Georgia law.

The Defendants moved for summary judgment on the Plaintiffs' claims, but Watson did not move for summary judgment on his counterclaim.

## II.  DISCUSSION

### A.  Motion for Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d at 1224.  The district court must "view all evidence in the light most

---

[8] The Court cannot read the Complaint to assert a Fourth Amendment claim by Poole for an unreasonable search and seizure of the Hartel home.

favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor." *Id.*

### B.  Claim and Immunity Overview

Again, it is difficult to discern from the Complaint the precise claims the Plaintiffs assert and against whom they are asserted.  Giving the Plaintiffs the benefit of the doubt, however, it appears they assert the following claims.  Lee asserts claims for federal and state constitutional violations against all Defendants for unreasonable search and seizure, false arrest, malicious prosecution, false imprisonment, and excessive force and against Mitchum and Boney for inadequate training and supervision.  Poole and Jimmie assert the same claims as Lee, except they do not assert claims for malicious prosecution, and they assert claims for failure to "intervene" against all Defendants.  However, based upon discussion with counsel at oral argument, it is probably more helpful to divide the Plaintiffs' claims into two categories: those based on conduct before Lee "showed" his pistol to Watson and those based on conduct occurring after that event.

The Defendants argue they are entitled to qualified immunity on all federal individual capacity claims.  "'Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right.'"  *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Hadley v. Gutierrez,* 526 F.3d 1324, 1329 (11th Cir. 2008)).  "There can be no doubt" that deputies effectuating an arrest are performing discretionary duties.  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  "'Once discretionary authority is established, the burden then shifts to the

plaintiff to show that qualified immunity should not apply.'" *Edwards*, 666 F.3d at 1294

(quoting *Lewis v. City of West Palm Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009)).  To

evaluate claims of qualified immunity, the Court must determine "whether the officer's

conduct amounted to a constitutional violation" and "whether the right violated was

'clearly established' at the time of the violation." *Lewis*, 561 F.3d at 1291.  This two-step

process may be done in whatever order is deemed most appropriate for the case. *Id.*

(citing *Pearson v. Callahan*, 555 U.S. 223 (2009)).

       With regard to federal official capacity claims, the Defendants argue they are

entitled to Eleventh Amendment immunity.

       With regard to state individual capacity claims, the Defendants argue they are

entitled to official immunity.  With regard to state official capacity claims, the Defendants

argue they are entitled to sovereign immunity.

### C. Federal Individual Capacity Claims that Arose Before Lee "Showed" His Pistol to Watson

       "It is axiomatic that the 'physical entry of the home is the chief evil against which

the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740,

748 (1984) (quoting *United States v. United States District Court*, 407 U.S. 297, 313

(1972)).  As such, it is a "'basic principle of Fourth Amendment law that searches and

seizures inside a home without a warrant are presumptively unreasonable.'" *Welsh*,

466 U.S. at 748-49 (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).  "The

presumption is rebutted, and the arrest lawful, only when some exception to the warrant

requirement—such as consent or exigent circumstances—exists." *Bates v. Harvey*, 518

F.3d 1233, 1239 (11th Cir. 2008).

Watson's counsel conceded at oral argument that Watson did not have probable cause to enter the Hartel home, but he argued Watson had consent to enter the home without a warrant.  However, there is, at best from Watson's standpoint, a question of fact whether the consent was still valid.  While Lee initially asked Watson to come in to discuss matters, Watson responded that he would not enter the home.  Lee then said Watson could write a ticket and be over with it, and instructed Jimmie and Poole to come inside, clearly terminating the discussion.  When Watson entered the home, his intent was not to discuss the matter, but to arrest Lee for littering and obstruction.

Thus, the Plaintiffs have met their burden of establishing a constitutional violation.  Because it was clearly established that Watson could not make a warrantless entry of the home absent consent, he is not entitled to qualified immunity at this posture.

Accordingly, the Motion is denied with regard to Lee and Jimmie's federal individual capacity claims that arose before Lee "showed" his pistol to Watson and granted with regard to Poole's federal individual capacity claims, if indeed she asserts any, that arose before Lee "showed" his pistol to Watson.

### D. Federal Individual Capacity Claims that Arose After Lee "Showed" His Pistol to Watson

#### 1. Lee's False Arrest, Malicious Prosecution, and False Imprisonment Claims

Lee's claims for false arrest and malicious prosecution are relatively easy to resolve, given one overarching fact:  Lee picked up a gun and "showed" it to a law enforcement officer as the officer was attempting to place him under arrest and ordered Watson not to take his gun out of his holster.  The Court accepts as true, for now, the Plaintiffs' assertion that Lee never pointed the pistol directly at Watson and

acknowledges, as the Plaintiffs request, the fortunate fact that "Deputy Watson had **left the Hartels' home unharmed**." (Doc. 48, at 12) (emphasis in original). However, whether Lee pointed it at Watson or "showed" it to him makes no material difference.

"There is no question that an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment." *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997). In a 42 U.S.C. § 1983 action, the plaintiff has the burden of establishing the absence of probable cause. *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998). False arrest is an "arrest under process of law, without probable cause, when made maliciously." O.C.G.A. § 51-7-1. For a malicious prosecution claim, a plaintiff must establish: "(1) a criminal prosecution; (2) instigated without probable cause; (3) with malice; (4) pursuant to a valid warrant, accusation, or summons; (5) that terminated in the plaintiff's favor; and (6) caused the plaintiff damage." *Gibbs v. Loomis, Fargo, & Co.*, 259 Ga. App. 170, 173-74, 576 S.E.2d 589, 592 (2003). A trial court's denial of a motion for a directed verdict of acquittal constitutes a "binding determination of the existence of probable cause." *Monroe v. Sigler*, 256 Ga. 759, 761, 353 S.E.2d 23, 25 (1987).

Pursuant to O.C.G.A. § 16-10-24(a), one commits the crime of misdemeanor obstruction when he "knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties." If the individual offers or does violence to the person of such law enforcement officer, he has committed the crime of felony obstruction pursuant to O.C.G.A. § 16-10-24(b).[9]

---

[9] The Plaintiffs do not argue that Lee could brandish his pistol and order Watson to holster his pistol because Watson's entry into the house to arrest Lee was not "lawful." Rightly so, given the facts here Lee had no right to use a firearm to resist arrest, lawful or unlawful.

Watson clearly had probable cause to believe that Lee had violated O.C.G.A. § 16-10-24. Given the circumstances, it is understandable that Watson did not arrest Lee immediately. When Watson returned with reinforcements and notwithstanding the Plaintiffs' belief that the degree of reinforcement was unnecessary, the deputies still had probable cause to arrest Lee.[10] Further, Lee's motion for directed verdict of acquittal at his criminal trial was denied. Thus, because Lee has failed to establish a lack of probable cause for his arrest, and thus has failed to demonstrate a constitutional violation, Lee has not met his burden of removing the Defendants' qualified immunity on his false arrest and malicious prosecution claims.

The Defendants also are protected by qualified immunity on Lee's false imprisonment claim. "A § 1983 claim of false imprisonment requires a showing of common law false imprisonment and a due process violation under the Fourteenth Amendment." *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009). With regard to the common law element, false imprisonment is the "unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty." O.C.G.A. § 51-7-20; *Westbury v. Clanton*, 136 Ga. 795, 72 S.E. 238, 238 (1911). "The only essential elements of the action being the detention and its unlawfulness, malice and the want of probable cause need not be shown."[11] *Ferrell v. Mikula*, 295 Ga. App. 326, 329, 672 S.E.2d 7, 10 (2008) (citations and quotations omitted). "'[T]he defendant

---

[10] The Plaintiffs also argue the Defendants needed a warrant to stand outside the home, but there is no merit to this argument.

[11] Many cases analyze false arrest and false imprisonment claims together. However, this approach is improper because the lack of probable cause is an element of false arrest, but not false imprisonment.

in a false imprisonment case premised upon a warrantless arrest does not meet his defensive burden merely by demonstrating the existence of probable cause but he must go further and show that the arrest was also effectuated pursuant to one of the exigent circumstances enumerated in O.C.G.A. § 17-4-20(a).'" *Ferrell*, 295 Ga. App. at 330, 672 S.E.2d at 11 (quoting *Collins v. Sadlo*, 167 Ga. App. 317, 319, 306 S.E.2d 390, 392 (1983)) (alteration in original).  Section 17-4-20(a) allows an arrest to be made "if the offense is committed in such officer's presence or within such officer's immediate knowledge."  With regard to the due process violation element, the plaintiff must prove the defendant acted with deliberate indifference, meaning the defendant had subjective knowledge of a risk of serious harm and disregarded that risk by actions beyond mere negligence.  *Campbell*, 586 F.3d at 840.

Here, any "detention" inside the home was not unlawful because it was effectuated pursuant to section 17-4-20(a) in that the offense took place in Watson's presence.  Further, the Defendants did not act with deliberate indifference.  Thus, because Lee has failed to establish both common law false imprisonment and a due process violation under the Fourteenth Amendment, the Defendants retain qualified immunity on his false imprisonment claim.

### 2.  Lee's Excessive Force Claim

Lee claims Boney used excessive force when he tased him, albeit with no effect because the probes stuck in his clothing.  Lee claims he was unarmed at the time.

The fact that Lee was unarmed is not dispositive because a TASER typically is used to subdue an unarmed suspect.  In *Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004), the suspect, later the plaintiff, also was unarmed.  In *Draper*, a deputy pulled

over a truck driver allegedly because his tag was not properly illuminated.  The deputy shined a light into the cab of the truck, and the driver politely asked the deputy not to shine it in his eyes.  The deputy asked the driver to walk behind the truck.  The driver complied, but shouted and complained about the light.  The deputy requested the driver's license and proof of insurance.  The driver did not retrieve the requested documents, but rather paced back and forth and shouted at the deputy.  After asking the driver to retrieve the documents for the fifth time, the deputy discharged a TASER at the driver's chest.  The driver fell to the ground and was arrested.

The Eleventh Circuit held that there was probable cause to arrest the driver pursuant to Georgia's misdemeanor obstruction statute.  The Eleventh Circuit also held that the deputy's use of the TASER did not constitute excessive force.  Given the similarities between these cases, it is appropriate to quote the excessive force analysis at length:

> In the circumstances of this case, Reynolds's use of the taser gun to effectuate the arrest of Draper was reasonably proportionate to the difficult, tense and uncertain situation that Reynolds faced in this traffic stop, and did not constitute excessive force.  From the time Draper met Reynolds at the back of the truck, Draper was hostile, belligerent, and uncooperative.  No less than five times, Reynolds asked Draper to retrieve documents from the truck cab, and each time Draper refused to comply.  Rather, Draper accused Reynolds of harassing him and blinding him with the flashlight.  Draper used profanity, moved around and paced in agitation, and repeatedly yelled at Reynolds.  Because Draper repeatedly refused to comply with Reynolds's verbal commands, starting with a verbal arrest command was not required in these particular factual circumstances.  More importantly, a verbal arrest command accompanied by attempted physical handcuffing, in these particular factual circumstances, may well have, or would likely have, escalated a tense and difficult situation into a serious physical struggle in which either Draper or Reynolds would be seriously hurt.  Thus, there was a reasonable need for some use of force in this arrest.

> Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury.  Indeed, the police video shows that Draper was standing up, handcuffed, and coherent shortly after the taser gun stunned and calmed him.  The single use of the taser gun may well have prevented a physical struggle and serious harm to either Draper or Reynolds.  Under the "totality of the circumstances," Reynolds's use of the taser gun did not constitute excessive force, and Reynolds did not violate Draper's constitutional rights in this arrest.

*Draper*, 369 F.3d at 1278.

Here, as in *Draper*, Lee was pacing around, shouting obscenities at the deputies, and refusing their commands to come outside.  This conduct, of course, gave the deputies probable cause to arrest Lee.  Also, as in *Draper*, Boney only fired a single shot, despite the Plaintiffs' claim that Boney shot Lee "one or three times."  (Doc. 48, at 27); (Doc. 46, at 29); (Doc. 45, at 18).  There is nothing in the record to support the claim that Lee was tased more than once.

The factual differences between *Draper* and the situation here provides far greater support for the conclusion that the force used was not excessive.  Although it turned out that Lee was was unarmed at the time he was tased, the officers knew he could have had a pistol because he "showed" it to Watson a couple of hours earlier.  Also, unlike *Draper*, the TASER here did not knock the suspect down.  In fact, Lee told deputies they would have to tase him more than once to take him down.  Despite Lee's invitation to use more force to subdue him, the deputies declined to do so.  In short, under these facts, a single shot from a TASER that failed to stun does not establish a constitutional violation, and the Defendants are entitled to qualified immunity on his excessive force claim.

### 3. Lee's Inadequate Training and Supervision Claims Against Mitchum and Boney Claims

In "limited circumstances," inadequate training or supervision can subject a defendant to section 1983 liability. *Gold v. City of Miami (Gold II)*, 151 F.3d 1346, 1350 (11th Cir. 1998). The plaintiff must prove that the inadequate training or supervision constituted "deliberate indifference" to the rights of its inhabitants. *Id.* "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1351. This burden is "intentionally onerous for plaintiffs" to prevent municipalities from being subject to *respondeat superior* liability. *Id.* at 1351 n.10.

The Complaint and the Plaintiffs' briefs are particularly inadequate with regard to Lee's claim for inadequate training. In a one-paragraph section of his brief headed "The Officers Did Not Have Extensive Training," Lee offers no specific evidence or argument demonstrating that a lack of appropriate training caused the injuries he claims to have suffered at the hands of Boney. He simply concludes that "arguably" there was a need for "specific, additional training." (Doc. 46, at 32). Lee does not directly attack Boney's qualifications or training to use a TASER. In fact, Boney was certified to use a TASER. (Doc. 53, Deposition of Billy Boney, at 25).

Nor does Lee offer any understandable argument to support his inadequate supervision claim. Apparently he believes that because Mitchum and Boney were supervisors and were involved in the events, their supervision was inadequate. In other

words, because the events happened, there must have been improper supervision.

Because Lee has failed to show a constitutional violation, his claim for inadequate

supervision fails.

Because Lee has failed to establish a constitutional violation for inadequate

training or supervision, Mitchum and Boney retain to qualified immunity on these claims.

### 4.  Poole and Jimmie's False Arrest and False Imprisonment Claims

Poole and Jimmie allege they were falsely arrested and imprisoned because they

were handcuffed and placed into a patrol vehicle during the standoff with Lee.  The

Defendants argue Poole and Jimmie were not arrested and, in the alternative, they

could have been arrested for misdemeanor obstruction.

The threshold false arrest inquiry is whether Poole and Jimmie were arrested.

An individual is in custody if "under the totality of the circumstances, a reasonable man

in the suspect's position would feel a restraint on his freedom of movement fairly

characterized as that 'degree associated with a formal arrest' to such extent that he

would not feel free to leave."  *United States v. Phillips*, 812 F.2d 1355, 1360 (11th Cir.

1987) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 430 (1984)).  Here, Poole and

Jimmie were handcuffed and placed into a patrol vehicle.  They were never told why

they were being placed into custody.[12]  A reasonable person in their position would

have felt they were not free to leave, and thus they likely were arrested.

---

[12] According to Radebaugh, he did not tell Poole why she was being placed into custody
because "[w]ith her being irrational, [he] didn't think it would make much of a difference.  At the
time, she was hollering and screaming and cussing…."  (Doc. 58, Deposition of Scott
Radebaugh, at 34).

Assuming Poole and Jimmie were arrested,[13] they cannot establish both a lack of probable cause and malice to prevail on a false arrest claim.  In a section 1983 action, "an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed."  *Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997).  "[B]ecause only arguable probable cause is required, the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed."  *Id.*  Here, there was arguable probable cause to arrest Poole and Jimmie for misdemeanor obstruction because they were shouting at the deputies who were there to arrest Lee and who found themselves in a tense standoff with a suspect thought to be armed.

Further, the deputies did not act with malice.  "Malice consists in personal spite or in a general disregard of the right consideration of mankind, directed by chance against the individual injured."  O.C.G.A. § 51-7-2.  Here, the record establishes that the deputies were concerned about safety.  The sheriff's office blocked a nearby road to secure the area.  Radebaugh told Thompson and company to leave the premises for their safety.  Significantly, Poole and Jimmie were released from custody once Lee was secured.  While Poole and Jimmie believe they would have been safer inside, it is clear the deputies were directed by a desire to protect, not harm.  Thus, because there was

---

[13] *Miranda* warnings are not an issue in this action, as "failure to give *Miranda* warnings would prevent use of statements in a criminal trial, but has no significance in an action against police officers for deprivation of a plaintiff's civil rights."  *Jones v. Cannon*, 174 F.3d 1271, 1291 (11th Cir. 1999).

probable cause and a lack of malice, Poole and Jimmie have failed to meet their burden for removing the Defendants' qualified immunity on their false arrest claims.

Additionally, Poole and Jimmie's false imprisonment claims fail for the same reason as Lee's.

### 5.   Poole and Jimmie's Excessive Force and Failure to Intervene Claims

Poole and Jimmie claim being handcuffed and placed into a patrol vehicle during a standoff between the deputies and Lee constitutes excessive force.  "[A] minimal amount of force and injury … will not defeat an officer's qualified immunity in an excessive force case."  *Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000).  "Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."  *Rodriguez v. Farrell*, 280 F.3d 1341, 1352 (11th Cir. 2002).  In section 1983 cases, "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (*however severely*) a pre-existing condition the extent of which was unknown to the officer at the time."  *Id.* at 1353 (emphasis added).

> Whether an officer used excessive force turns on a number of factors, such as "the severity of the crime, whether the suspect posed an immediate threat, and whether the suspect was resisting or fleeing.  Use of force must be judged on a case-by-case basis...."  Because of this lack of a bright-line standard, 'qualified immunity applies unless application of the standard would inevitably lead' a reasonable officer in the defendant's position to conclude that the force was unlawful.

*Gold v. City of Miami (Gold I)*, 121 F.3d 1442, 1446 (11th Cir. 1997) (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993)).

Here, a reasonable deputy would be entitled to use the force necessary to arrest Poole and Jimmie for misdemeanor obstruction.  The force applied to Poole and Jimmie

consisted of handcuffing and pulling, which would be deemed *de minimis* in this Circuit. Thus, the excessive force inquiry turns on the nature of the injuries.

Despite Lee claiming the deputies "manhandled" his wife, Jimmie did not tell the deputies that she was in pain.  Instead, Jimmie primarily was concerned with pulling her top down.  Jimmie later felt pain on the right side of her body, but she never received treatment for injuries allegedly resulting from her detention.[14]  The pain to the right side of her body is consistent with her surgery in 2005 to remove the top part of her right lung, and there is no evidence the deputies knew about that surgery.  Because the force and injury to Jimmie were *de minimis*, she cannot defeat the Defendants' qualified immunity on her excessive force claim.

The injuries sustained by Poole arguably were more severe.  First, unlike Jimmie, Poole informed the deputies that she was in pain.  Second, she testified that she underwent surgery on her right wrist two months after the incident for an injury she claims she suffered as a result of being handcuffed.  However, she also testified she had surgery on her right wrist in the early 1980s for a ganglion cyst,[15] and, according to medical records, she was given an injection in her right wrist for an inflammation in April 2007.  (Doc. 31-6, at 2).  There is no evidence the deputies were aware of these preexisting conditions.  Pursuant to *Rodriguez*, the actions of the deputies did not constitute excessive force because Poole never told the deputies about her preexisting

---

[14] Jimmie went to a doctor who took X-rays even though the doctor found no signs of bruising. (Doc. 31-7, at 2).

[15] A ganglion cyst is a tumor or swelling that most commonly occurs at the wrist join.  One large cyst or many smaller ones may develop.  WebMD, Ganglion Cyst Symptoms, Causes, Tests, and Treatment, http://www.webmd.com/a-to-z-guides/ganglion_cyst (last visited Mar. 29, 2012).

condition or that handcuffs could aggravate her condition.  Thus, Poole has not met her

burden of removing the Defendants' qualified immunity on her excessive force claim.

Of course, because there was no excessive force, there can be no constitutional

violation for the failure to intervene.  *Crenshaw v. Lister*, 556 F.3d 1283, 1293-94 (11th

Cir. 2009).  Thus, Poole and Jimmie's failure to intervene claims fail as a matter of law.

### 6.   Poole and Jimmie's Inadequate Training and Supervision Claims Against Mitchum and Boney Claims

The discussion above with regard to Lee's inadequate supervision claim also

applies to Poole and Jimmie's inadequate supervision claims.  Whereas Boney's

TASER training was the focus of Lee's inadequate training claim, the deputies' training

on arrests and the use of force is the focus of Poole and Jimmie's inadequate training

claims.  The Plaintiffs concede the deputies testified that they received training on

arrests, but they claim the deputies did not testify to receiving training on the use of

force.  Not only have the Plaintiffs failed to present evidence of a need to train on

making arrests, the record contradicts their assertion that the deputies did not testify to

receiving such training. (Doc. 58, Deposition of Scott Radebaugh, at 12); (Doc. 57,

Deposition of Robert Rodgers, at 21); (Doc. 56, Deposition of Williams Stokes, at 7);

(Doc. 55, Deposition of Alex Bell, at 20); (Doc. 53, Deposition of Billy Boney, at 9); (Doc.

52, Deposition of Darren Mitchum, at 9).  Thus, Poole and Jimmie have failed to

establish a constitutional violation for inadequate training or supervision, and Mitchum

and Boney retain qualified immunity on these claims.

Accordingly, the Motion is granted with regard to all federal individual capacity

claims that arose after Lee "showed" his pistol to Watson.

**E.  The Plaintiffs' Federal Official Capacity Claims**

The Plaintiffs concede the Eleventh Amendment bars federal claims seeking monetary relief against Sheriff Mitchum in his official capacity.  However, Mitchum would also be entitled to Eleventh Amendment immunity on injunctive relief claims because the Plaintiffs do not seek prospective relief for continuing violations of federal law.  *Badillo v. Thorpe*, 158 Fed. Appx. 208, 212 n.6 (11th Cir. 2005).[16]  The Plaintiffs have failed to show that Eleventh Amendment immunity has been waived.  Thus, the Motion is granted on all federal official capacity claims against Mitchum.

The Plaintiffs argue the remaining Defendants are not entitled to Eleventh Amendment immunity.  However, Judge Royal of this District recently held that a "sheriff's deputies are entitled to the same Eleventh Amendment immunity against official capacity claims as the sheriff."[17]  *Howell v. Houston County, Ga.*, 2011 WL 3813291, at *27 (M.D. Ga.).  Even if the deputies are not entitled to Eleventh Amendment immunity, as stated above, the Plaintiffs have not established a federal constitutional violation once Lee "showed" his pistol.[18]  Thus, the Motion is granted on all federal official capacity claims against the remaining Defendants.

---

[16] "Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.

[17] The Court acknowledges that the Eleventh Circuit has not decided whether Eleventh Amendment immunity applies to a sheriff's deputies.  *Jordan v. Mosley*, 487 F.3d 1350, 1354 n.3 (11th Cir. 2007).

[18] The Court understands that the analysis for individual capacity and official capacity claims is not the same, and merely asserts that, as a practical matter, the deputies acted properly.

**F.  The Plaintiffs' State Claims**

With the exception of their claims for assault, battery, and free speech, the Plaintiffs' state claims are the same as their federal claims.  State employees may only be sued for performing their discretionary functions if they acted with "actual malice or with actual intent to cause injury in the performance of their official functions."  Ga. Const. Art. 1, § 2, ¶ IX(d).  Georgia courts recognize that arrests by deputies are discretionary functions.  *Selvy v. Morrison*, 292 Ga. App. 702, 665 S.E.2d 401 (2008); *Reed v. DeKalb County*, 264 Ga. App. 83, 589 S.E.2d 584 (2003).  Also, the Georgia Court of Appeals "has consistently held that the operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function as opposed to a ministerial, proprietary, or administratively routine function."  *Russell v. Barrett*, 296 Ga. App. 114, 121, 673 S.E.2d 623, 629 (2009) (citation omitted).  Official immunity applies even when there is no probable cause for an arrest.  *Selvy*, 292 Ga. App. at 706, 665 S.E.2d at 405; *Reed*, 264 Ga. App. at 86, 589 S.E.2d at 587.

Here, the Plaintiffs have failed to show any actual malice by the Defendants to defeat official immunity.  With regard to Lee, the Plaintiffs allege the Defendants were seeking revenge, but they only went to the Hartel home because Lee "showed" a gun to a deputy who tried to place him under arrest.  If the deputies really wanted revenge, they would have roughed him up once he was in custody.

With regard to Poole and Jimmie, there was no actual malice because the deputies placed them into custody for their own safety.

Additionally, the Plaintiffs have failed to show sovereign immunity has been waived on their state official capacity claims.

Accordingly, summary judgment is granted on the Plaintiffs' state claims.


### III.    CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment is **GRANTED in part and DENIED in part** with regard to Lee and Jimmie and **GRANTED** with regard to Poole.

SO ORDERED, this the 29th day of March, 2012.


<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT